TRUST OF HAROLD B. SPERO, U/A DATED MARCH 29, 1939, GERALD D. SPERO, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59444. Filed June 30, 1958.

*John P. Allison, Esq.*, and *Edgar Nathan, III, Esq.*, for the petitioner.

*John M. Doukas, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the calendar years 1949 and 1950 in the respective amounts of $8,275.44 and $12,966.23. The deficiencies result principally from the respondent's determination that the basis of shares of stock sold by the petitioner-trust was the cost thereof to the settlor of the trust rather than the fair market value at the date of the settlor's death which was used as the basis in computing the gain reported in the income tax returns.

The petitioner alleges error in the respondent's failure to use fair market value at date of death as the basis, and, alternatively, in failing to include in basis a portion of (1) the amount paid to the settlor's widow in settlement of litigation instituted by her against the trust, (2) attorneys' fees incurred in the litigation, and (3) Federal and New York State estate taxes paid by it. It claims that it overpaid its taxes for both years.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioner is a trust created under an agreement dated March 29, 1939, between Harold B. Spero (herein sometimes called Harold) then residing in Erie, Pennsylvania, as grantor and his brother, Gerald D. Spero, a doctor, then residing in Detroit, Michigan, as trustee. The petitioner's fiduciary income tax returns for the calendar years 1949 and 1950 were filed with the collector of internal revenue at Detroit, Michigan.

Immediately prior to the creation of the trust Harold and another brother, Harry Spero, together with members of Harry's family, were the owners of substantially all the issued stock of the United Linen Service Corporation (herein called United Linen) and Youngstown Towel and Laundry Company (herein called Youngstown Towel). All of the stock of both corporations was no-par common stock. The stockholdings were as follows:

|  | United Linen | Youngstown Towel |
| --- | --- | --- |
| Harry and family | 203 | 198 |
| Harold | 149 | 150 |
| Qualifying shares | 2 | 2 |
| Total | 354 | 350 |

Both Harry and Harold were active in the businesses of the corporations. Harry was president and was in charge as the controlling stockholder in both corporations. Harold was vice president and general manager. At the time of the creation of the petitioner-trust, relations between Harry and Harold had become strained and they did not work together harmoniously. Harold was a widower and was contemplating marriage to Gladys Walcoff. The other directors were apprehensive that as the result of the marriage, Harold's stock might pass to Gladys, or the heirs of Harold and Gladys, and thus bring outside interests into the corporations. In order to avoid this possibility Harry and the corporations' counsel insisted that Harold's stock be placed in trust. The trust instrument under which the petitioner-trust was created was prepared by counsel for the corporations. Harold at first refused to sign the trust instrument, and did sign it only after being threatened with removal from the positions of vice president and general manager.

The corpus of the trust consisted of 146 shares of the common stock of United Linen and 147 shares of the common stock of Youngstown Towel, all of which shares were transferred to the trust by Harold out of his holdings. This was the entire corpus at all times prior to

the sale of some of the stock. Under the trust instrument Harold "irrevocably sold, assigned, transferred, conveyed, delivered and set over" the shares of stock to the trustee for enumerated purposes among which were the following:

6. The Trustee agrees to pay to me the entire net income derived from the Trust estate which shall include dividends as may be received and such other income or property received from the Truste (*sic*) estate in quarterly installments or oftener as advisable to him during my natural life.

The Trustee shall pay and deliver to me in addition thereto from time to time, such further amounts from principal of the Trust as it may deem proper and necessary for my maintenance, support, comfort and enjoyment absolute discretion being vested in the Trustee to determine what may be necessary or proper for such purposes.

The trust instrument also contained the following provisions:

9. The Trust hereby created is an irrevocable Trust. I, by the execution and delivery of this instrument, and by the transfer of the property described in this Trust Agreement, do forever relinquish all claim, right or title thereto, save and except my right to receive the income or dividends during my life as herein provided.

* * * * * * *

11. This Trust is made for the benefit of my children, Morton, Donald and Elizabeth Spero, and in addition thereto, such after born children of my body as I may have, in proportion to the interest as hereinafter set forth, subject to my right to receive the income and dividends during my life.

* * * * * * *

14. This Trust shall not fail by reason of the death, resignation, or removal of the Trustee. In the happening of such event, I reserve the right to designate a successor to said Trustee. In the event of my inability to so designate said Trustee or in the event of my failure so to do within sixty (60) days after the death, resignation or removal of said Trustee, then The Dollar Savings and Trust Company of Youngstown, Ohio, is hereby appointed successor Trustee and all the provisions, conditions and covenants herein contained shall be binding upon said successor Trustee.

Upon the death of the grantor each of his three children by an earlier marriage was to receive one-fourth of the corpus of the trust. The remaining one-fourth was reserved for distribution among after-born children, if any; if none, then the remaining fourth was to be divided among the three who were living at the time of the creation of the trust. The trustee was to distribute the corpus of the trust to the beneficiaries when they reached the age of 30 years.

Harold and Gladys Walcoff were married on March 30, 1939. They remained married until the death of Harold on June 26, 1946. The only issue of the marriage was a daughter, Terry Inez Spero, who was born on August 19, 1945.

The three children of Harold by his earlier marriage survived him. One of them died on February 29, 1952.

At the time of the marriage of Harold and Gladys in 1939, Gladys did not know of the creation of the trust. She did not learn of the existence of the trust until sometime in 1942.

At sometime in 1945 Gerald Spero addressed a memorandum to Harold stating, "When the kids come home & this should be soon, I'll gladly resign the trusteeship." At that time the children may have been in school, at work or in the armed services. Harold never asked Gerald to resign, and Gerald continued to be the trustee up to the time of the hearing in this case.

Harold died intestate, domiciled in the State of New York. Letters of administration were issued to his widow Gladys by the Surrogates Court on July 22, 1946. Within the time required by law Gladys as administratrix of the estate of Harold caused Federal and New York estate tax returns to be filed on behalf of Harold's estate. Neither return included in the gross estate any of the assets held by Gerald as trustee under the agreement of March 29, 1939. Thereafter, following audit of the Federal estate tax return, a deficiency in estate tax was proposed based on the determination that the assets of the trust were includible in Harold's gross estate. The proposed adjustments were agreed to by the administratrix. On or about December 29, 1949, the petitioner-trust paid to the collector of internal revenue, Upper New York district the sum of $76,900 on account of Federal estate tax on the estate of Harold, and also paid to the New York State Tax Commission the sum of $6,525 on account of New York estate tax on that estate. The taxes so paid were based upon determinations that at the time of Harold's death the value of the United Linen stock was $1,525.12 per share and that the value of Youngstown Towel stock was $252 per share. Of the total tax payments made by the petitioner, there was charged against the $80,000 payment to Gladys W. Spero (as hereinafter set forth) the sum of $8,425 representing her pro rata share of Federal and New York estate taxes, leaving a net payment by petitioner on account of New York and Federal estate taxes of $75,000, substantially all of which was attributable to the inclusion in gross estate of the assets of the trust.

The cost to Harold of the United Linen stock transferred by him to the petitioner-trust was $192.74 per share and the cost to him of the Youngstown Towel stock transferred to the petitioner-trust was $47.35 per share.

In May 1947, Gladys instituted two suits, one individually and one as guardian of her daughter, Terry Inez Spero, in the United States District Court for the Eastern District of Michigan, against Gerald individually and as trustee under the trust agreement of March 29, 1939.

In her individual suit Gladys alleged that Harold had made certain representations to her about his financial worth prior to marriage and represented that if she married him, he would devise and bequeath to her one-third of his stockholdings; that in reliance on his representations she did marry him. It was further alleged that after Gladys agreed to marry him Harold, without the knowledge of Gladys, had transferred substantially all of his assets to Gerald under the trust agreement with the intent of defrauding her and depriving her of any interest or share in his estate. It was also alleged that the trust was a subterfuge for the continued ownership, dominion, and control of the stock by Harold and was executed in pursuance of the plan of Harold to deprive her of the fruits and benefits of the pre-marital agreement and of her rights as a widow in the estate and assets of Harold upon his death. Among the prayers for relief were prayers that Gladys be decreed to be the owner of one-third of the shares of stock of the two corporations held by Gerald in trust and that a decree be entered directing Gerald to transfer, convey, and deliver to Gladys one-third of the shares of stock, assets, or other property held by him under the trust agreement.

As a result of negotiations for a compromise of the suits by Gladys there were joined as parties the individual beneficiaries, namely, Morton Spero, Donald Spero, Lizbeth Spero Straus, and Gladys, as guardian of Terry Inez Spero. On May 20, 1948, all parties to the suits signed a stipulation of settlement which was filed with and approved by the District Court in which the suits had been instituted. By the stipulation the parties agreed that a decree might be entered holding that Gladys was entitled to the beneficial ownership of one-third of the shares of stock of the United Linen and Youngstown Towel corporations held by Gerald in the corpus of the trust. The material remaining portions of the agreement were that while Gladys was entitled to have one-third of the shares transferred to her, she would not make any demand for a transfer thereof if Gerald, as trustee, paid to her the sum of $80,000 in full settlement of the claim asserted by Gladys in her suit; and if Gerald, as trustee, should create a trust fund with a corpus of $80,000, to be paid out of the corpus of Harold's trust, of which the infant daughter, Terry Inez Spero, would be the beneficiary. These provisions were to be carried out by the trust within 14 months, or earlier in the event of the sale of corpus of the trust estate or assets of the corporations, in which event the petitioner was to be paid at the time the trustee received the consideration from such sale. Each item of $80,000 was to bear interest.

In pursuance of the stipulation of settlement, the petitioner-trust paid to Gladys the sum of $80,000 in the month of December 1949

as follows: $8,425 was paid to the district director of internal revenue and the New York State Tax Commission representing her pro rata share of estate taxes on the estate of Harold; $21,575 was paid to the attorney for Gladys; $50,000 was paid by delivery to Gladys of notes of United Linen in the amount of $39,000 and notes of Youngstown Towel in the amount of $11,000 payable to the trust and endorsed over to Gladys.

Also, pursuant to the stipulation of settlement, the petitioner-trust set aside an additional sum of $80,000 in a separate trust for the benefit of the daughter, Terry Inez Spero.

On December 28, 1949, the petitioner-trust sold 113 shares of United Linen stock for $368,000 payable in installments, and 115 shares of Youngstown Towel stock for $92,000 payable in installments. Both blocks of stock were parts of the corpus of the trust. During 1949 the petitioner received $64,000 on account of the selling price of the United Linen stock and $16,000 on account of the selling price of the Youngstown Towel stock. During 1950 it received $88,000 and $22,000 on account of the selling prices of the United Linen and Youngstown Towel stocks, respectively.

The petitioner-trust, in its fiduciary income tax returns, elected to report the sales of United Linen and Youngstown Towel shares on the installment basis. In computing the amount of capital gain on the sales it used as basis the estate tax valuations established in the estate of Harold, to wit: $1,525.12 for the United Linen stock and $252 per share for the Youngstown Towel stock. Using such basis, it reported on its 1949 return a long-term capital gain on the sales in the amount of $44,767.20, and on its 1950 return a long-term capital gain in the amount of $61,913.60.

The petitioner-trust paid attorneys' fees in connection with the suits instituted by Gladys in the aggregate amount of $13,200 of which $1,200 was paid in 1949, $6,000 in 1953, and $6,000 in 1954.

The respondent determined that the basis of the United Linen stock sold by the petitioner-trust in 1949 was $192.74 per share and that the basis of the Youngstown Towel stock sold was $47.35, which amounts represented the costs of the shares to Harold. He accordingly increased the amount of the capital gain realized in each of the years 1949 and 1950 as the result of the receipt of the installment payments in those years.

OPINION.

The only adjustments as to which error was assigned concern the proper basis for computing gain on the stock sold by the petitioner-trust in 1949.

The respondent computed the gain on the sale of the two blocks of stock sold by using as a basis the cost thereof to the settlor of the trust. The petitioner contends that the proper basis is the fair market value of the shares at the date of the settlor's death. The solution to this difference between the parties lies in whether basis is to be determined under the provisions of section 113 (a) (2) or (a) (5) of the Internal Revenue Code of 1939. The material parts of these statutory provisions as they existed at times pertinent herein are set out in the margin.[1]

The petitioner contends that the second sentence of section 113 (a) (5) governs the question here.[2] In order for the provisions of that sentence to be applicable there must be (1) a retention by the settlor of the trust income for life *and* (2) "the right reserved to the grantor at all times prior to his death to revoke the trust * * *."

Quite plainly the first of these conditions is met here by the terms of the trust instrument. The controversy is whether the second condition—the right to revoke—exists.

Upon examination of the trust instrument we do not find therein any provision which meets the statutory requirement. The power to invade corpus, and thereby revoke *pro tanto* is vested solely in the trustee in the words: "The Trustee shall pay * * * such further amounts * * * as it may deem proper and necessary * * * absolute discretion being vested in the Trustee * * *." This language gives no vestige of any power to the settlor. That the settlor did not intend to reserve any power of revocation is demonstrated by other provisions whereby the settlor declared that: "The Trust * * * is an irrevocable trust. I * * * do forever relinquish all claim, right or title thereto, save and except my right to receive the income or

[1] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.
(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—
* * * * * * *
(2) GIFTS AFTER DECEMBER 31, 1920.—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, * * *
* * * * * * *
(5) PROPERTY TRANSMITTED AT DEATH.—If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. In the case of property transferred in trust to pay the income for life to or upon the order or direction of the grantor, with the right reserved to the grantor at all times prior to his death to revoke the trust, the basis of such property in the hands of the persons entitled under the terms of the trust instrument to the property after the grantor's death shall, after such death, be the same as if the trust instrument had been a will executed on the day of the grantor's death. * * *
[2] We have, in connection with prior cases, carefully examined the legislative history of this particular provision. See *Rosalie W. Post*, 26 T. C. 1055; and *Hazel B. Beckman Trust*, 26 T. C. 1172. For purposes of the instant case suffice it to say that the legislative history shows that where the facts are such that the second sentence of section 113 (a) (5) is applicable, the basis of the property sold is the same whether the sale is made by the trustee or by a beneficiary of the trust.

dividends * * *. The property transferred to the Trustee is and shall be considered as an out and out gift from me to my children * * *."

In the case of *Minnie M. Fay Trust "A"*, 42 B. T. A. 765, there was a similar factual situation in that the grantor had not reserved any power of revocation in the trust instrument, but had placed in a committee of three named persons the power to change or alter the trusts. In holding that section 113 (a) (5) was not applicable for the determination of basis we said that "there is no ambiguity in section 113 (a) (5)" and that under it fair market value at the date of the death is the basis "only where the right to revoke is reserved *to the grantor.*" We further said in that case:

In all other instances in the revenue acts where the vesting of a power to revoke in a person *other than the grantor* is to have tax consequences there is a careful and explicit statement to that effect. See sections 166 and 167 of the 1934 Act and section 302 of the 1926 Act. [Emphasis supplied.]

The *Fay Trust "A"* case, *supra*, was followed in *Rosalie W. Post*, 26 T. C. 1055, where the grantor reserved the right to alter the terms of the trust, including changing the beneficiaries, but provided that he "shall have no power to revoke" the trust. In holding that section 113 (a) (5) did not govern the determination of basis on sale of the trust property we pointed out that the legislative history of section 113 (a) (5) required that there be a *"complete* right of revocation * * * on the part of the grantor at all times * * *."[3] In that case it was the respondent who was contending for the application of section 113 (a) (5). We there said:

The respondent's argument here seems similar to the argument he advanced in *Minnie M. Fay Trust "A"*, 42 B. T. A. 765 (1940), and that advanced by the taxpayers in *Commonwealth Trust Co. of Pittsburgh* v. *United States*, 96 F. Supp. 712 (W. D., Pa., 1951). In those cases the courts held that anything less than a clear power of complete revocation would not bring an inter vivos trust within the purview of section 113 (a) (5). We so hold here. Cf. *Edith Hilles Dewees*, 1 T. C. 791 (1943). See 3 Mertens, Law of Federal Income Taxation, sec. 21.78.

The case of *Hazel B. Beckman Trust*, 26 T. C. 1172, cited by the petitioner, is not authority for a decision in this case. We there held that under section 113 (a) (5) the basis of trust property was the value at the time of the grantor's death. In that case the grantor, in the trust instrument, expressly reserved to herself at all times up to her death the right to revoke the trust with the consent of named trustees, none of whom had any adverse interest in the trust.

---

[3] Quoted, with emphasis added, from H. Rept. No. 1882, 70th Cong., 1st Sess., 1939–1 C. B. (Part 2) 447, accompanying the Revenue Act of 1928.

The petitioner, while recognizing that on its face the trust instrument states that it is irrevocable, nevertheless argues that the fact that the non-adverse trustee, the brother of the grantor, had a broad power to invade corpus, serves to bring the case within the ambit of section 113 (a) (5). In this connection the petitioner refers to the testimony of the trustee, the substance of which was that in the exercise of his discretion regarding the invasion of corpus for the maintenance, support, comfort, and enjoyment of the settlor he would have complied with the settlor's instructions "in most instances," and that he would not have exercised his power of invasion without concurrence of the settlor. As we understand the petitioner, it is argued that this amounted to a veto power of the settlor over any action of the trustee in connection with the power of invasion, and that this was tantamount to a power in the settlor to revoke. We think there is no merit to this argument. The trust agreement required the trustee to exercise his discretion in determining whether it was proper and necessary to invade corpus for the benefit of the settlor. We are not here concerned with what the parties might or might not have done, but with the question of whether in the trust instrument the settlor retained rights amounting to a power to revoke. This he did not do. The petitioner cites certain estate tax cases arising under section 811 (d) where the concurrence of the settlor was the vital act necessary to amend or terminate a trust. See, for example, *Estate of Charles M. Thorp*, 7 T. C. 921, affd. (C. A. 3) 164 F. 2d 966. In addition to the fact that those cases arose under different statutory provisions, they would, in any event, be clearly inapplicable here since there is no provision in the trust instrument here involved providing for the concurrence of the settlor with anyone for the purpose of amending or terminating the trust.

It is argued by the petitioner that, wholly aside from the question whether the decedent reserved a power of revocation, he did retain until his death sufficient rights to constitute him the substantial owner of the property, and that this is sufficient to provide a new income tax basis at death. In support of this argument he refers, in addition to the matters just above discussed, to the fact that he had the power to name anyone as trustee in the event of the death, resignation, or removal of the original trustee. It is argued that this would include the right to appoint himself trustee and that this has special significance because the original trustee offered to resign effective as soon as the settlor's children returned home. We see no merit to this argument which in effect denies the validity and effectiveness of the trust. In addition, it is sufficient to point out that the settlor did not retain in the trust instrument any power of removal of the

trustee. The fact that the trustee in 1945, 6 years after the creation of the trust, indicated that he would be willing to resign, is not of any significance in the determination of the question here presented.

Following the *Fay Trust "A"* case, *supra*, we hold that basis may not be determined under the provisions of section 113 (a) (5), and the respondent is sustained in determining that the proper basis for computing the gain on the sales of the shares was the cost thereof to Harold Spero, in accordance with section 113 (a) (2).

*Effect on basis of stock sold of the amount paid to Gladys, and the amount paid as attorneys' fees.*

The petitioner contends that if section 113 (a) (5) is not applicable the unadjusted basis of the trust corpus should be increased by the amount of $80,000 paid to Gladys, and the $13,200 paid as attorney fees, a proportionate part being allocated to the shares sold by the trust in 1949, thereby reducing the gain realized. The basis for this contention is the claim that both items represent cost of defending title to trust property.[4]

The suits brought by Gladys, one on her own behalf and one on behalf of her minor daughter, in which all the beneficiaries of the trust were joined, raised issues with regard to both the rights of the parties as heirs of Harold Spero and as beneficiaries of the trust created by him. Insofar as Gladys was concerned her suit was one primarily to establish her right, as Harold's widow, to a distributive share of Harold's estate under Decedent Estate Law of the State of New York. In paragraphs 13 and 14 of her amended complaint in that suit Gladys alleged that under that statute[5] a surviving spouse is entitled to one-third of the unbequeathed surplus of the personal property of a decedent, and that Harold executed the 1939 trust instrument for the purpose and with the intent of defrauding and depriving Gladys of any share in his estate. The prayers of the complaint were, in part, that Gladys be decreed to be the owner of one-third of the shares of stock, and that the trustee be required to deliver to her one-third of the shares of stock, or, in the alternative,

---

[4] Section 113 (b) (1) (A), I. R. C. 1939, provides in part:

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

   (1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

      (A) For expenditures, receipts, losses, or other items, properly chargeable to capital account, * * * .

Section 29.24–2 of Regulations 111 provides in part:

CAPITAL EXPENDITURES.—* * * The cost of defending or perfecting title to property constitutes a part of the cost of the property and is not a deductible expense. * * *

[5] Sec. 83, Decedent Estate Law, McKinney's Consol. Laws, Book 13.

30 T. C.

upon the election of the trustee to sell the stock, then to pay to her one-third of the proceeds of the sale.

The compromise settlement, approved by the Federal District Court, provided in part that "[a]ll of the parties hereto consent that a decree may be entered herein, providing that the plaintiff, Gladys W. Spero, is entitled to the beneficial ownership of one-third ($\frac{1}{3}$) of the shares of stock * * *."

In view of the terms of the pleadings in the suit and of the compromise settlement, it appears that Gladys was recognized as a distributee of Harold's estate and entitled to a one-third inheritance, including one-third of the stock held by the trust. However, Gladys did not take the stock but agreed to take $80,000 in settlement of the suit. Accordingly, under the holding of *Lyeth* v. *Hoey*, 305 U. S. 188, the amount she received is to be considered as a distribution in settlement of her rights in the estate as a surviving wife of the decedent. We fail to see how such a distribution could have the effect of increasing the basis of property in the hands of the fiduciary. Under the settlement agreement, the trust retained the stock and subsequently sold some of it in order to make the distribution. The fact that if she had taken the stock instead of cash and notes, her basis might have been greater than the basis in the hands of the trust, is no reason for holding that the basis of any of the stock in the hands of the trust should be increased for the purpose of computing the gain to the trust upon the sales.

The cases cited by the petitioner [6] are not in point in that they do not involve the payment by a trust of an amount in recognition of a right to property held by the trust.

We hold that the basis of the stock sold may not be increased on account of the $80,000 paid to Gladys.

Attorneys' fees in the amount of $13,200 were paid by the petitioner-trust in connection with the suits brought by Gladys against it. The petitioner also claims that that amount is a part of the basis of the stock sold in 1949, relying upon *Bowers* v. *Lumpkin*, (C. A. 4) 140 F. 2d 927; *Jones' Estate* v. *Commissioner*, (C. A. 5) 127 F. 2d 231; *E. W. Brown, Jr.*, 19 T. C. 87; and *Johnson* v. *Commissioner*, (C. A. 5) 162 F. 2d 844. It contends that even though not all of the fees were paid in 1949, the full amount constituted a lien on the trust assets and is a part of the basis under the rationale of *Crane* v. *Commissioner*, 331 U. S. 1.

It is our conclusion that the fees in question do not constitute a proper addition to the basis of the stock sold. These fees were in-

[6] *Klein* v. *Commissioner*, (C. A. 7) 84 F. 2d 310; *Corbett Investment Co.* v. *Helvering*, (C. A. D. C.) 75 F. 2d 525.

curred in connection with the adjudication of the rights of claimants as heirs of Harold and as beneficiaries under the trust created by him. As such, the expenditures may not properly be considered as incurred in defending or protecting title to property. None of the cases cited by the petitioner involve comparable facts. No authority is cited which would permit a fiduciary to add to the basis of its assets the costs incurred in adjudicating claims by beneficiaries or in making distributions to them. Moreover, we think that the basis could not in any event be increased by $12,000 of the fees paid in years subsequent to 1949, the year of sale. *Estate of Hetty B. Levy*, 17 T. C. 728. The *Crane* case involved a mortgage on property, and therefore is not comparable. Whether such fees are allowable deductions from gross income of the trust is not before us for decision in this case. But see *Trust of Bingham* v. *Commissioner*, 325 U. S. 365; and *Loyd* v. *United States*, 153 F. Supp. 416.

The petitioner also assigns as error the respondent's failure to include in the basis of the stock sold any part of the Federal and New York estate taxes paid by the trust because of the inclusion of the trust property in the gross estate of the estate of Harold B. Spero, deceased. The petitioner recognizes that we have held contrary to its contention in this respect in *Jules S. Bache Trust*, 24 T. C. 960, affirmed per curiam (C. A. 2) 239 F. 2d 385, certiorari denied 353 U. S. 950, but urges that we reconsider the decision in the *Bache* case. We think the *Bache* case was correctly decided and the petitioner cites no authority to show error in that decision. This contention of the petitioner is rejected.

*Decision will be entered for the respondent.*